UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

        Plaintiff,

                                            Case No. 19-cr-147-wmc

v.

AHMAD KANAN,

        Defendant.

---

## SENTENCING MEMORANDUM

---

Each of Kanan's crimes was serious and merits a significant prison sentence. Together, however, they show a complete disregard for truth and the law, and merit a sentence at the high-end of the guidelines. Kanan's criminal history, which includes a previous federal fraud conviction for which he served 37 months imprisonment, also supports a sentence at the top of the advisory guideline range, as ultimately calculated by the Court at sentencing.

**NATURE AND CIRCUMSTANCES OF THE OFFENSES**

*Offense in Case 19-cr-147*

Kanan's first crime was significant. He twice used money from a bank account of the Libyan Embassy to pay the sales and use tax (and interest and penalties) owed by his gas stations. (PSR ¶¶ 23-24). He also attempted to use the same account to pay the electric bill. (PSR ¶ 24). That Libyan Embassy account had been earmarked to pay the

1

educational expenses of Libyan students in the United States. (PSR ¶ 23). Although the money was eventually returned to the Libyan Embassy, it took time. Kanan made the first fraudulent payment of $83,783.41 on July 21, 2017. Those funds were not returned to the Libyan Embassy until December 6, 2017. Kanan made his second fraudulent payment of $108,053.02 on December 21, 2017. The process of starting to return those funds to the Libyan Embassy did not begin until mid-April 2018. Therefore, Kanan's crime had a significant impact on the Libyan Embassy by depriving it of money for numerous months and by causing its diplomats to have to spend time and resources dealing with the fallout of the crime.

Background regarding sales and use tax shows that Kanan's offense is aggravated. Gas stations (including Kanan's) collect sales and use tax directly from consumers at the point of sale. So, Kanan's businesses received the money to pay the taxes; he just chose not to pass it on to the state. In other words, Kanan only owed tens of thousands in back taxes, interest, and penalties because he was diverting the taxes he collected at the point of sale.

*Between Offenses*

Kanan became aware of the federal investigation for his unauthorized use of the Libyan Embassy Account when search warrants were executed on his gas stations and residence in December of 2018. In September of 2019, Kanan obtained a one-way ticket to Dubai, United Arab Emirates that left on September 21, 2019. Fearing that he would not return, the United States obtained a criminal complaint to arrest Kanan for the offense before he left the country. On September 25, 2019, after a contested detention hearing,

Kanan was released on conditions, including that "Defendant shall not commit any offense in violation of federal; state or local law while on release." (Case No. 19-cr-147, R. 8). Kanan quickly violated that order by committing the crimes that underlie the conviction in case 20-cr-81.

*Offense in Case 20-cr-81*

Kanan's second offense, investment and Paycheck Protection Program (PPP) fraud, is particularly egregious. COVID-19 (and subsequent lockdowns) caused economic devastation to many people in the United States.[1] To help ameliorate some of the economic damage, Congress passed the PPP as part of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), which allowed businesses to obtain private, low-interest loans to pay their payroll and other costs.[2] The amount of the PPP loan was typically approximately 2.5 times the applicant's average monthly payroll costs and could be forgiven if the applicant kept its payroll stable.[3] Kanan selfishly used the COVID-19 crisis to benefit himself.

Kanan made an obviously false misrepresentation in his PPP loan applications by indicating that he was currently not subject to an indictment. (PSR ¶¶ 14 & 16). If that was Kanan's only misrepresentation in the application, it would still be a serious crime. The United States has a valid interest in not wanting to loan money to applicants who are under indictment. Kanan, however, made an even more fundamental misrepresentation

---

[1] Unemployment Rates During the COVID-19 Pandemic: In Brief, Congressional Research Service, (available at https://fas.org/sgp/crs/misc/R46554.pdf).
[2] https://en.wikipedia.org/wiki/Paycheck_Protection_Program.
[3] *Id.*

in his PPP applications—that his business had a payroll. Bank records show no evidence that Kanan had a payroll—and he certainly did not have the payroll he falsely submitted with his applications. (*See* Case No. 19-cr-147, R. 74, pp. 4-5). Indeed, Kanan's bank records show that when he received the $47,060 PPP loan on May 7, 2020, he transferred it to his personal Wells Fargo Checking Account the next day. He did not use it to protect the payroll of his small business.

As part of the same scheme, Kanan defrauded Company 1 and obtained a $100,000 loan from them. The United States has documented Kanan's many misrepresentations to Company 1 before and after the loan in other filings, so it will not repeat them here. (*See e.g.*, Case No. 19-cr-147, R. 74, pp. 3-4). Not only did Kanan obtain the fraud proceeds from the PPP loan and Company 1, he engaged in concealment money laundering in violation of 18 U.S.C. § 1956 to hide the proceeds. Kanan transferred the fraud proceeds from Altin Labs' JP Morgan account, to his personal Wells Fargo checking account, to his personal Wells Fargo savings account, back to his personal Wells Fargo checking account, back to the original Altin Labs JP Morgan account, and then to a new Altin Labs account at Mercury Bank that neither lender knew about.

Kanan's scheme to defraud borrowers involved his lies to the borrowers to obtain the money, and also involved many other lies. For example, when Kanan fraudulently applied for a $72,500 PPP loan at Bank 1, the bank denied his loan because of the spelling discrepancies in Kanan's name. On the same day, Kanan sent a false email to Company 1, which stated "Could you connect me with a banker who is accepting PPP applications? I am still waiting on chase and [President of Bank 1] could not close the loan for us

4

because the company is relatively new, and we did not have the documents he requested." (PSR ¶ 56). To summarize, Kanan prepared a fraudulent loan application with numerous misrepresentations and submitted it to Bank 1. (PSR ¶ 14). When the bank caught one of the misrepresentations (the spelling of his name), he lied to minimize the discrepancies. (PSR ¶ 56). After Bank 1 decided not to issue the loan, Kanan immediately emailed Company 1 and lied about why Bank 1 denied the loan in order to fraudulently apply for more loans. (PSR ¶ 57).

Lies often cause collateral damage or potential collateral damage that is difficult to track. This case is no different. For example, Kanan repeatedly represented that Louisiana State University (LSU) Professor Husam Sadek was a co-founder and the Vice President of Technology Development for Altin Labs. (Case No. 19-cr-147, R. 74, pp. 3-4). Professor Sadek was interviewed and none of that turned out to be true. During the interview, Professor Sadek expressed concern about being listed as a co-founder of a business because that would potentially violate his contract with LSU.

**HISTORY AND CHARACTERISTICS OF THE DEFENDANT**

Kanan was previously convicted of a three-part fraud scheme in Vermont for which he served 37 months imprisonment. (PSR ¶ 83) ("the counts of conviction represented three separate schemes"). The counts of conviction involved a tax fraud scheme, a check kiting scheme, and a credit card fraud scheme. *Id.* Since these schemes were separate, they likely could have each resulted in separate convictions, which would have increased Kanan's current criminal history score. Further, if Kanan would have been sentenced separately for these separate crimes, his criminal history score would

have been even higher at the second sentencing.  Therefore, even though Kanan has a significant criminal history for a white-collar defendant, it is understated.

It is difficult to comment on Kanan's history and characteristics because different sources of information are inconsistent.  It is hard to know what is true.  For example, in the PSR, Kanan discussed how he lived in Libya from age six until eighteen.  (PSR ¶ 91).  That fact, when he was facing a charge involving the Embassy of Libya, did not appear in his Pretrial Services Report.  (Case No. 19-cr-147, R. 6).  The PSR mentions that Kanan obtained a Master's degree from Syracuse in computer engineering.  (PSR ¶ 105).  The resume he submitted to Company 1 does not list that degree.  (KANAN_002968).  The resume he submitted to Company 1 lists an extensive employment history, which was not mentioned in the PSR.  *Compare* (KANAN_002968) *with* PSR (PSR ¶ 107).  Kanan's resume also lists numerous academic accomplishments (awards, papers, presentations at conferences) that remain unverified and uncorroborated.[4]  Kanan has claimed to have earned a Ph.D. on many occasions, but he now states that he did all of his coursework but did not defend his dissertation.  (PSR ¶ 106).

It is equally difficult to know if Kanan was truthful with the Court at his previous sentencing in Vermont.  At sentencing, Kanan stated he was "'deeply and gratefully sorry' for his crimes and he would regret them for the rest of his life."  (PSR ¶ 83).  Kanan

---

[4] For example, Kanan claims to have been awarded an IBM Ph.D. Fellowship in 2013, which seems unlikely given that he was released from prison for his previous fraud conviction in January of 2012.  He also claimed to have presented a paper at the CERN RD 50 Meeting, 2015.  There appears to have been two such conferences in 2015 (one in Switzerland and one in Italy).  He is not listed as a participant in either conference.  *See* (https://agenda.infn.it/event/11109/registrations/participants; https://indico.cern.ch/event/456679/registrations/participants).

continued that "he lost his honor and dignity, and most importantly, he jeopardized the future of his children. He said he failed to uphold the values of his faith and culture. He acknowledged that his actions brought shame and suffering to his parents, siblings, wife, and children." *Id.* The Court believed him and noted " . . . there's a depth of regret and even despair . . . that suggests that . . . this has had a profound impact on him." Regardless of whether Kanan sincerely believed what he was telling the Court, his subsequent actions did not match his rhetorical flourishes. Kanan's supervised release for the crime expired on January 12, 2017. (Case No. 13-cr-18, R. 3 (W.D. Wis.)). He committed his next federal crime on July 21, 2017. (PSR ¶ 34).

While it can be difficult to distinguish between lies and oversights or miscommunications, some instances are clear. For instance, Kanan's supervised release from Vermont was transferred to the Western District of Wisconsin before this Court. (Case No. 13-cr-18). In order to terminate his supervision while still owing restitution, the probation officer filed a 12A petition dated October 11, 2016, which summarized Kanan's financial situation by stating, "The defendant has been an electrical engineering graduate student at the University of Wisconsin Madison for the past several years. The defendant also works for his father's gas stations and receives financial support from his family for doing so." (Case No. 13-cr-18, R. 3). Kanan's representations to his probation officer reflected in the filing do not appear to be accurate. The United States' investigation in Case No. 19-cr-00147 did not show that he was working for his father's gas stations, but instead that he was acting as an owner of his own gas stations. Kanan very likely had significantly more income (*e.g.*, the sales and use taxes and other money he was pulling

7

out of the businesses) than he represented to his probation officer. Therefore, Kanan likely did not pay nearly as much restitution as he could or should have.

The way Kanan treats money and debt is dishonest. He appears to take on debt without any plan or intention to pay it back. Gas station employees reported that various vendors regularly hounded Kanan for him to pay the money owed. The Court received an unsolicited letter from a flooring and painting contractor in Northern Vermont who described how "Dr. Kanan" was not paying him for services rendered (Case No. 19-cr-147, R. 72). Kanan's $340,000 condominium in Vermont is now in foreclosure proceedings (Case No. 2019-cv-00108 (D. Vt.)). Indeed, Kanan has a tremendous amount of debt. (PSR ¶¶ 108 & 109) (listing $435,602.28 in non-mortgage, non-business debt).

**CONCLUSION**

For the above reasons, the government respectfully requests a sentence at the top of the advisory guideline range.

Respectfully submitted this 14th day of January, 2021 at Madison, Wisconsin.

        SCOTT BLADER
        United States Attorney

        By:     /s/

        MEREDITH P. DUCHEMIN
        ZACHARY J. COREY
        Assistant United States Attorneys