UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    *Plaintiff*,

  *vs.*                                       Case Nos.  19-cr-147-wmc &
                                                                       20-cr-81-wmc

AHMAD KANAN,

    *Defendant.*

**SENTENCING MEMORANDUM**

       The government and Kanan agree that a 41-month sentence is sufficient but not greater than necessary to achieve sentencing's goals. It's his properly calculated guideline range's high-end, and Kanan has earned it. The guidelines neither exaggerate nor minimize his sentencing's factors—his recidivism, the loss amount, his post-offense conduct, his miserable pretrial detention, and his ultimate acceptance of responsibility.

       What follows will augment the government's memorandum's careful reasoning with a broader look at Kanan's life, followed by the defense's own case for the high-end sentence. The Court shouldn't impose a day more. Or less.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC

1. **Factual Background**

    a. **Early Years**

Kanan was born on July 21, 1971, in Cairo, Egypt—a society in transition. Nasser had died the year before, and President Sadat had just begun a wholesale purge of the government and armed forces of Nasserists. Meanwhile, Egypt's military was engaged in a war of attrition with Israel over the Sinai Peninsula. In October 1973 matters escalated when Egypt and Syria launched coordinated attacks on Israel—what's known in the West as the Yom Kippur War. It was a disastrous choice for Egypt. In a counter-offensive, Israeli forces made it to within 70 miles of Cairo before hostilities concluded.[1] In 1977, the Kanan family left Egypt for Libya, hoping for greener pastures. (*See* Presentence Report, ¶ 92.) The getting was good. Economic liberalization and the removal of price controls had led to food riots.[2]

The move turned out to be the right call. By 1980 Egypt had a per capita GDP of about $600. In the same year Libya, with its much smaller and

---

[1] *See, generally*, Abraham Rabinovich, *The Yom Kippur War: The Epic Encounter That Transformed the Middle East*, 498 (Knopf/Doubleday 2007); Hamied Ansari, *Egypt, the Stalled Society*, 168 et seq. (SUNY 1986).
[2] *See* Ansari at 185-207.

less fractured population, could boast a per capita GDP of about $13,000.[3] Kanan, a gifted student, pursued an education, earning a high school diploma by the late 1980s. (*See* PSR, ¶ 93.)

Initially, Kanan sought post-secondary education in Jordan, but when he had the opportunity to study at Northeastern University in Boston, he jumped at the chance. In Massachusetts he met his first wife, a massage therapist. Things went well for several years, but then the marriage ended in divorce after it became apparent that the couple could not conceive. (*See* PSR, ¶¶ 93-95.)

Looking back, Kanan's high-water mark was 2001. He earned a bachelor's degree in electrical engineering and married his wife, Ghufran. (*See* PSR, ¶¶ 96 & 107.) The couple eventually moved to upstate New York so Kanan could attend a Masters' program in computer science at Syracuse University. (*See* PSR, ¶ 107.) Their years there saw the births of their first two children. (*See* PSR, ¶ 96.)

---

[3] The date here is available from the International Monetary Fund. *See* "Arab Republic of Egypt" *available at* https://www.imf.org/en/Countries/EGY; "Libya" *available at* https://www.imf.org/en/Countries/LBY.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC

### b. The Fall

For the years 2003 to 2007, Kanan appeared committed to throwing it all away. He had succeeded far beyond what the world would have expected from the child born to modest means in a country where war and social unrest were the norm. The frauds described in the presentence report mostly involved large sums but more troublingly also included relatively small-scale schemes. One at least can comprehend taking a criminal risk for a big payoff; it's still criminal, but one can wrap one's mind around it. On the other hand, taking the same risks for small sums is harder to grasp. His frauds were so brazen that it's as if he were begging to get caught. (*See* PSR, ¶ 85.)

And Kanan was caught. In 2007, he was charged in federal court in Vermont for his fraud crimes. At sentencing, Judge Sessions acknowledged that he could conclude that Kanan had an offense level of 25.[4] If he had, then Kanan's guidelines range would have been 57 to 71 months. Instead, he applied an offense level of 21, which resulted in a range of 37 to 46 months. He then imposed a sentence at the bottom of the range.[5]

---

[4] *See United States v. Ahmad Kanan*, 07-cr-53-wks, DE 59:55. (D. Vt. Apr. 14, 2009).
[5] *See id.* at 59:55-57.

The district court ordered a self-surrender date of April 28, 2009.[6] Kanan did his time at the satellite camp adjoining USP-Canaan. (*See* PSR, ¶ 85.) The BOP released him to supervised release on January 13, 2012.[7] He was lucky to still have his family. His wife had given birth to their third child during the Vermont prosecution, shortly before his entry into custody.

The years that followed Kanan's release were promising. He earned another master's degree—this time in electrical engineering from the University of Wisconsin. (PSR, ¶ 108.) By January 2017, he had completed supervision "without any difficulties." (PSR, ¶ 85.) Nearly a decade had passed since his arrest for the Vermont prosecution. He had lost much, but the pieces remained in place for him to live an enviable life.

Today, it has been just over four years since Kanan was discharged from supervised release. The blatant self-sabotage he displayed over that period is of a kind typically seen only among especially sick drug addicts. With his background in computer science, he must have known that it would take little from law enforcement to discover how the funds got from the Bank of America account to the Wisconsin Department of Revenue and

---

[6] *See United States v. Ahmad Kanan*, 07-cr-53-wks, DE 56 (D. Vt. Mar. 26, 2009.)
[7] *See* "Find an inmate" *available at* bop.gov/inmateloc/.

the utility provider. One doesn't even need a background in computer science to understand the senseless risk because there's no reason anyone *else* would commit a fraud to pay another person's tax bill. Primary school children understand *Qui bono?* The PPP fraud makes even less sense because, if the business had any measure of success, Kanan's deceptions would have surfaced because future lenders, investors, or employees would have come into the picture. As the business interacted with additional third-parties, it's a lock that someone's due diligence would have revealed everything.

### 2.   Kanan and the government agree that the Court should impose a 41-month sentence.

The Court should sentence Kanan to 41 months' imprisonment because it is sufficient but not greater than necessary to achieve sentencing's goals. The defense will not rehearse the government's thoughtful analysis. (*See* DE 83 in 19-cr-147 & DE 79 in 20-cr-81.) And his frauds' victims' remarks to the government and to this Court speak for themselves.

Instead, Kanan aims to augment these contributions—but from the defense viewpoint. Federal criminal defense practitioners' work is primarily sentencing mitigation. It's a task they do most often and one that involves the most time. And fundamental to sentencing mitigation is the search for

Section 3553(a) factors that the sentencing guidelines either exaggerate or don't capture.

Here, the guidelines range of 33 to 41 months' imprisonment fairly approximates the driving factors here. Kanan is a recidivist. His prior federal felony conviction rightly puts him in criminal history category II. On the other side of the chart, his offense level neither exaggerates nor minimizes his criminal conduct. The loss amounts aren't stratospheric and much of the damage he caused could be unwound—albeit over a period of months. But the Court can't ignore that the Libyan mission is an honored guest of the people of the United States. Dante puts traitors to their guests in the Ninth Circle's second-to-last region—only Judas and other traitors to God have it worse. Neither the obstruction of justice enhancement, nor the alternative two-level increase under USSG §2B1.1(b)(9)(C) for violating a judicial order, overstates the crime's seriousness because Kanan no longer gets the benefit of the doubt about what he was up to on iCloud after law enforcement seized his devices. Effectively adding two levels for his conduct while on pretrial release for the 2019 case is neither harsh nor lenient.

The parties agree that the guidelines range should reflect that Kanan has accepted responsibility for his crimes. He had every right to go to trial,

but he eventually did the right thing. He saved all stakeholders the trial's burden. He would have lost, but not until after the government and the Court had expended time, money, and resources to present and receive the evidence. Kanan didn't go to trial, and the Court shouldn't sentence him as if he did.

A final word. Despite Kanan's miserable experience in pretrial confinement, the defense joins the government's recommendation for a high-end sentence of 41 months rather than a sentence at the range's lower-end. He's been incarcerated since last June, when he was arrested in Vermont. He spent the next several months on his way back to Wisconsin, meandering through county jails, which is about the hardest time an inmate can do. And it was all during the COVID-19 pandemic; he was frequently isolated or segregated. Then, shortly after his transfer from the Dane County Jail to the Sauk County Jail, he finally got sick and suffered through coronavirus's agonizing effects.

No doubt the Court's sentence should account for these especially awful months. But the brute fact remains that Kanan brought it on himself. That he was detained because of new criminal conduct offsets the experience's mitigating force.

Dated at Madison, Wisconsin, this January 19, 2021.

                                      Respectfully submitted,

                                      *Peter R. Moyers*
                                      Peter R. Moyers
                                      Counsel for Mr. Kanan

FEDERAL DEFENDER SERVICES
 OF WISCONSIN, INC.
22 East Mifflin Street, Suite 1000
Madison, Wisconsin 53703
Tel: 608-260-9900
Fax: 608-260-9901
peter_moyers@fd.org